AO 108 (Rev. 06/09)  Application for a Warrant to Seize Property Subject to Forfeiture

**FILED**

MAR 3 0 2010

TERESA L. DEPPNER, CLERK
U.S. District Court
Southern District of West Virginia

# UNITED STATES DISTRICT COURT
### for the
### Southern District of West Virginia

| | | |
|---|---|---|
| In the Matter of the Seizure of | ) | |
| *(Briefly describe the property to be seized)* | ) | |
| roceeds on deposit in Account No. XXXXXX3002, and | ) | Case No.    2:10-mj-00029 |
| Account No. XXXXXX7905, Wesbanco Bank, Inc., Wheeling, | ) | |
| West Virginia, in the name of Katherine A. Hoover | ) | |
| | ) | |

## APPLICATION FOR A WARRANT
## TO SEIZE PROPERTY SUBJECT TO FORFEITURE

I, a federal law enforcement officer or attorney for the government, request a seizure warrant and state under penalty of perjury that I have reason to believe that the following property in the _____Northern_____ District of _____West Virginia_____ is subject to forfeiture to the United States of America under ___18___ U.S.C. § ___981(a)(1)(C)___ *(describe the property)*:

Proceeds on deposit in Account No. XXXXXX3002, and Account No. XXXXXX7905, Wesbanco Bank, Inc., Wheeling, West Virginia, in the name of Katherine A. Hoover, up to the total sum of $4,604.565.00.

The application is based on these facts:
See Affidavit in support, attached hereto and incorated herein.

☑ Continued on the attached sheet.

_____
*Applicant's signature*

JAMES F. LAFFERTY, II, Special Agent - FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: Feb 25 2010

_____
*Judge's signature*

City and state:  Charleston, West Virginia

Honorable Mary E. Stanley, U.S. Magistrate Judge
*Printed name and title*

Redacted
3·29·10
MKS

## AFFIDAVIT

BRANCH BANKING AND TRUST AND WESBANCO, BANK ACCOUNTS AND BMW

STATE OF WEST VIRGINIA

COUNTY OF KANAWHA, to wit:

I, James F. Lafferty II, being first duly sworn, do hereby depose and state as follows:

### I. INTRODUCTION

A. Background of Affiant

    1. I am a Special Agent with the Federal Bureau of Investigation (FBI), and have served in this capacity for approximately seven years. I am currently assigned to the Huntington, West Virginia Resident Agency where I focus my attention towards health care fraud and public corruption matters. Prior to joining the FBI, I received my Bachelor's of Science in Business Administration degree with a focus in accounting. In 1998, I obtained my Certified Public Accounting license, which is still active in the state of West Virginia.

    2. The FBI has provided me with training related to health care fraud matters, as well as financial forfeiture matters related to health care fraud and other criminal acts involving the illegal accumulation of assets. I have also had experience dealing with physicians and others who distribute controlled substances unlawfully and for a profit in a business/medical practice setting.

    3. The information contained in this affidavit has been obtained by or provided to me by individuals knowledgeable of the subject matter, including others in law enforcement who have provided me with information they have obtained during the ongoing investigation. Therefore, this

affidavit does not include every fact gathered during the course of this investigation, but simply includes selected facts needed to obtain the probable cause to obtain seizure warrants for:

(a)    Proceeds on deposit in Account No. XXXXXXXXX6880, Account No. XXXXXXXXX6899 and Account No. XXXXXXXXX6902, Branch Banking and Trust, Williamson, WV in the name of William F. Ryckman, M.D. up to the total sum of $4,604,565.00;

(b) Proceeds on deposit in Account No. XXXXXX3002, and Account No. XXXXXX7905, Wesbanco Bank, Inc., Wheeling, West Virginia, in the name of Katherine A. Hoover, up to the total sum of $4,604,565.00;

(c) A 2007 BMW Model 335I Convertible VIN #WBAWL73597PX50531; and

(d) Proceeds on deposit in Account No. XXXXXXXXX9358 and XXXXXXXXX9439, Branch Banking and Trust, Williamson, West Virginia, in the name of Myra C. Miller, up to the total sum of $4,604,565.

B. Nature of Investigation

4. The Drug Enforcement Administration (DEA), the West Virginia State Police (WVSP), the Department of Health and Human Services/Office of the Inspector General (DHHS/OIG), and the FBI are conducting an ongoing criminal investigation of the Mountain Medical Care Center, LLC, (Mountain Medical) (previously known as the Williamson Wellness Center (WWC)) located at 35 West Third Avenue in Williamson, West Virginia. I know from my personal observation and from my review of documents and statements of others, that Katherine Hoover M.D., William Ryckman, M.D., and J. Victorio Teleron, Jr., M.D., are/were physicians practicing at Mountain Medical. Investigation indicates that Dr. Hoover, Dr. Ryckman and Dr. Teleron have unlawfully

distributed controlled substances to patients through Mountain Medical. The investigation has also revealed that Myra Miller, Camille Heslel, and other employees of Mountain Medical, conspired with the above named physicians, and others in unlawfully distributing and obtaining the controlled substances and in committing health care fraud.

5.  This activity may constitute the following and other criminal violations:

(a) 21 U.S.C. § 846(a)(1),  conspiracy to distribute  controlled substances;

(b) 21 U.S.C. § 841(a) (1),  distribution of  controlled substances;

(c) 21 USC § 843 (a) (2), use of a registration number issued to another person to distribute controlled substances;

(d)  21 U.S.C. § 843(a)(3), obtaining controlled substance by fraud;

(e) 18 U.S.C. § 1347, health care fraud; and

(f) 18 USC § 2. aiding and abetting.

WILLIAM F. RYCKMAN, M.D.

6.  According to the West Virginia Board of Medicine website,  Dr. Ryckman's preferred mailing address as 127 American Lane, Sutersville, Pennsylvania. He does not list a current work address. Dr. Ryckman attended medical school at the State University of New York at Buffalo School of Medicine and Biomedical Science. His primary specialty is listed as a family practice. He has an active medical license with the state of West Virginia.  His license was originally granted in March of 1997.

7.  On June 8, 2004, the West Virginia Board of Medicine entered into an agreement with Dr.

3

Ryckman. This agreement was a result of a complaint of improper prescribing practices made on June 1, 2002, by Michael Burton, R.Ph. The complaint alleged that Dr. Ryckman, while living in the State of Pennsylvania, was telephoning controlled substance prescriptions to pharmacies in West Virginia and Kentucky for patients who were being seen by a Physical Therapist at Ryckman's office in Williamson, West Virginia.

8.   Upon receiving the aforementioned complaint, the West Virginia Board of Medicine initiated an investigation and secured the services of an independent physician. This physician reviewed ten (10) of Dr. Ryckman's patient files covering the periods of 2001 through 2002. The physician found that all of these patients were diagnosed as "chronic non-malignant pain patients." A report generated by the independent physician on May 14, 2003, outlined concerns that Dr. Ryckman offered little or no follow up re-evaluation on subsequent office visits, no evidence of x-ray reports, or special testing. All patients were seen on a monthly basis apparently for the sole purpose of renewing prescriptions for federally scheduled narcotics. The physician reviewed pharmacy printouts for Ryckman's patients and concluded that they were filling an "astronomical" amount of narcotic prescriptions. The reviewing physician formed the opinion that Dr. Ryckman failed to follow the guidelines of the West Virginia Board of Medicine for the use of opioids in the treatment of chronic "non-malignant" pain. The West Virginia Board of Medicine also concluded that Dr. Ryckman's record-keeping was inadequate to justify the course of treatment, and his prescribing practices, specifically controlled substances, were below the recognized standard of care.

9.   As a result of the reviewing physician's report and the West Virginia Board of Medicine's findings, a Consent Order was filed on June 8, 2004. This Consent Order outlined the fact that Dr. Ryckman was publicly reprimanded for over prescribing narcotics to his patients, for deficiencies

in medical diagnosis, treatment, and medical care. Dr. Ryckman was ordered to pay the State of West Virginia a civil fine in the amount of $2,500.00.  Lastly, the Order directed Dr. Ryckman to successfully complete an intensive course in record keeping, and an intensive course in controlled substance management, at his own expense. Dr. Ryckman was also ordered to provide documentation confirming that he had successfully completed the said courses.

KATHERINE A HOOVER, M.D.

10.  According to the West Virginia Board of Medicine website, Dr. Hoover's preferred mailing address as Route 2, Box 203, Lost Creek, Harrison County, West Virginia. Her primary work location is listed as Mountain Medical Care Center, 35 West 3rd Avenue, Williamson, West Virginia. (The investigation indicates that Dr. Hoover's primary residence is the Lost Creek address and that she generally resides there with her husband from Friday until Monday.  She shares an apartment with Dr. Diane E. Shafer, at 114 West Second Avenue, Williamson, West Virginia during her work week.  Dr. Shafer is under investigation for conduct similar to that discussed herein.  In December 2009, Dr. Shafer voluntarily surrendered her DEA registration and West Virginia medical license.)  Dr. Hoover attended medical school at the Michigan State University College of Human Medicine. Her primary specialty is listed as internal medicine. She has an active medical license with the state of West Virginia. She first obtained her license in July of 1978.

11.  On November 10, 2004, charges were filed against Dr. Hoover by the West Virginia Board of Medicine, in an amended complaint, alleging that, in October of 1995, Dr. Hoover while performing a gynecological exam on a seventeen year old patient, asked the patient if she and her friends would be willing to come to her home and have sex with her teenage sons. Dr. Hoover denied

the allegations.

12. The hearings related to this complaint not only validated the complaint, but evidence surfaced that a letter allegedly written by a medical assistant who worked at the clinic where Dr. Hoover was seeing the patient, was actually written by Dr. Hoover. This letter was written to make Dr. Hoover look more favorable during the hearing.

13. In October of 2008, Dr. Hoover's license to practice medicine was put on probation for five (5) years. Dr. Hoover is only allowed to practice under the supervision of one or more physicians that were approved by the board.

J. VICTORINO R. TELERON, JR., M.D.

14. According to the West Virginia Board of Medicine website, Dr. Teleron's preferred mailing address 250 Whispering Woods Road, Charleston, West Virginia, which is also his home address. His primary work location is listed as 35 West 3rd Avenue, Williamson, West Virginia. Dr. Teleron attended medical school at the University of the Philippines, School of Medicine. His primary specialty is listed as internal medicine. He has an active medical license with the state of West Virginia. He first obtained his license in January of 1982.

C. Controlled Substance Violations

15. At all relevant times, Dr. Hoover possessed a valid DEA registration in West Virginia and was authorized to prescribe controlled substances. The current location of her registration is 35 West Third Avenue, Williamson West Virginia. At all relevant times Dr. Ryckman possessed a valid DEA Registration in West Virginia and was authorized to prescribe controlled substances. The current location of his registration is 35 West Third Avenue, Williamson, West Virginia. In

approximately August 2008, Dr. J. Victorino Teleron began his employment at the Mountain Medical Care Center. From August 11, 2008, Teleron was registered with DEA at 35 West Third Avenue in Williamson, West Virginia, and was authorized to prescribe controlled substances.

16.   A physician who wishes to possess, distribute, dispense, or prescribe controlled substances as part of his or her professional practice must do so pursuant to a DEA registration (21 U.S.C. § 822; 21 C.F.R. 1301.11).   A prescription for a controlled substance must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. 21 C.F.R. 1306.04(a).  It is a violation of 21 U.S.C. § 843(a)(2) to use a DEA registration number issued to another person to distribute controlled substances.

17. A physician violates 21 U.S.C. § 841 (unlawful distribution of controlled substances) when: (a) the physician distributes or dispenses a controlled substance; (b) the physician acts knowingly and intentionally; and (c) the physician's actions are not for a legitimate medical purpose in the usual course of his professional medical practice or are beyond the bounds of medical practice. (United States v. Singh, 54 F. 3d 1182, 1186 ).

18. The term "controlled substance" means a drug or other substance included in Schedules I, II, III, IV and V as contained in 21 U.S.C. § 812 and 21 C.F.R. 1308.11, 12, 13, 14 and 15.

19. The term Lortab is a trade name for hydrocodone a schedule III controlled substance.

20. The term Xanax a trade name for alprazolam a schedule IV controlled substance.

21.   Both hydrocodone and alprazolam are popular drugs of abuse that are commonly obtained by fraud, diverted and sold on the streets for a profit.  Taken together they can produce a heightened affect for the drug user/abuser.

7

22. The term "distribute" means to deliver (other than by administering or dispensing) a controlled substance 21 U.S.C. § 802(11). This includes issuing prescriptions.

## II. INVESTIGATION

23. Your affiant has knowledge from numerous patients of Mountain Medical, and through undercover visits to Mountain Medical, that the standard operating procedure regarding the prescribing of controlled substances used at the clinic is as outlined below.

24. A patient making his initial visit to the clinic is charged four hundred and fifty dollars. The cost of the visits has increased over the years. Medicaid and Medicare are not accepted. A majority of patients pay for their office visits with cash. On the patient's first visit he is seen by a practitioner. The majority of patients receive the same prescriptions (hydrocodone and alprazolam). It is generally requested that the patient obtain an MRI or X-Ray. All controlled substance prescriptions are called-in by the clinic and the patient is given a list of approved locally owned pharmacies located in West Virginia and Kentucky from which he may choose for his call-in to be placed. No re-fills are given on controlled substance prescriptions and patients are required to visit the clinic each time a prescription is needed. On subsequent visits the patient generally does not see a practitioner. Instead, the patient is simply asked by the receptionist if his complaint is still the same and if he has had any changes since the last visit. The patient's vital signs are taken and he is asked if he wants to see a practitioner. If the patient states that his complaint is the same and does not want to see a practitioner a prescription is called in for the same controlled substances as obtained during the previous visit. The patient is required to pay one hundred and fifty dollars for the follow up visits. In 2009, the clinic called in controlled substance prescriptions for approximately

8

175 patients per day, assuming a five day work week, fifty weeks a year.

COURT TESTIMONY

25. The following individuals provided testimony on the record in the Mingo County West Virginia Circuit Court. These individuals testified that they received their controlled substances from Mountain Medical. The individuals also described their experiences with Mountain Medical below:

(a) ███████████████████████████, testified on March 6, 2003, that he received Lortabs and Xanaxes from Dr. Ryckman. ██████ advised that he did not have any type of CT Scans, x-rays, or blood work performed at Mountain Medical. Instead, he told Dr. Ryckman that he had lower back pain and headaches. ██████ added that he did not see a physician on every visit, but would instead have the prescription called in by someone at Mountain Medical.

(b) ████████████ (████████████), testified on March 6, 2003, that he obtained controlled substances from Dr. Ryckman. ██████ obtained these controlled substances after explaining to Dr. Ryckman that his back and head hurt. Dr. Ryckman did not perform any type of testing to determine what caused ████ pain. ██████ also testified that Dr. Ryckman was not at the office during half of his office visits.

(c) ████████ (████████████), testified on March 24, 2005, that he was addicted to Hydrocodone and received his prescription from Dr. Hoover at Mountain Medical for approximately three year ████ advised that he did not have any type of diagnostic testing conducted while under the care of Dr. Hoover, and only saw Dr. Hoover five or six times during the three year time period. Mountain Medical patients are generally required to at least visit the clinic once a month in order to continue receiving their prescriptions.

9

(d) ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ testified on March 5, 2009, that he has been a patient of Dr. Hoover for approximately three years. He testified that he saw Dr. Hoover on his first visit and approximately five more times over a three year time period. Again, it should be noted that Mountain Medical patients are required to "see" the doctor once a month in order to continue receiving their prescriptions.

(e) ▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓ testified on March 9, 2009, that he has been Dr. Hoover's patient for approximately eight years. ▓▓▓▓ has gone an entire year without seeing Dr. Hoover. ▓▓▓▓ would go to Mountain Medical and see one of the receptionist who he would pay for his office visit. He would then be called back, weighed, and have his blood pressure taken. He would then be asked if his medication was working, and where he wanted to fill his prescription. ▓▓▓▓ would use his month's worth of prescribed medication in under a week. ▓▓▓▓ was required to pay for an office visit once a month.

(f) ▓▓▓▓▓▓ testified on April 2, 2009, in criminal court Mingo County, West Virginia, where he was charged with selling his prescription medication. ▓▓▓▓ testified that the hydrocodone he was selling was prescribed by Dr. Hoover. ▓▓▓▓ advised that he would pay one hundred fifty dollars ($150.00) per office visit. After waiting fifteen to twenty minutes, his name would be called. He then would have his blood pressure taken, he would be weighed, and he would be asked a couple questions ▓▓▓▓ estimated this meeting with staff lasted approximately five (5) minutes. He advised that he was receiving ninety (90) hydrocodone and thirty (30) Valium tablets. He advised that he saw Dr. Hoover maybe one time in two years.

10

(g) ▮▮▮▮▮▮▮▮ testified on April 2, 2009, that she was receiving hydrocodone from Dr.

Hoover as well as other physicians. ▮▮▮▮▮ added that she had to see a physician other than Dr.

Hoover because Mountain Medical did nothing more than check your weight and blood pressure,

and then call in your prescription.  Records from the West Virginia Board of Pharmacy indicated that

during a three (3) year time period ▮▮▮▮▮ has obtained hydrocodone and Xanax from multiple

physicians while receiving the same type of medication from Dr. Hoover.


WITNESS STATEMENTS

    26.  On Thursday, April 23, 2009, ▮▮▮▮▮▮▮▮▮▮ was interviewed. She advised that

she had obtained prescriptions for hydrocodone and diazepam, also known as Valium, a schedule

IV controlled substance, from Dr. Hoover from 2003 to 2007 at the WWC. ▮▮▮▮▮ advised that she

had heard through a friend you could visit WWC, say you had an injury, and receive hydrocodone.

▮▮▮▮▮ advised that on her first visit she paid two hundred fifty dollars ($250.00) and filled out a

large amount of forms. She stated she then had her vitals taken and waited to see the doctor. ▮▮▮▮

advised that she saw Dr. Hoover and told her that she had hurt her back at work and wanted pain

medication. Dr. Hoover conducted a short exam and engaged her in conversation about her personal

life. ▮▮▮▮ advised she was then called in prescriptions for hydrocodone and diazepam.

    27.  ▮▮▮▮ advised that she would travel from Barboursville, West Virginia, to WWC once

a month and pay one hundred fifty dollars ($150.00).  The round trip would normally take in excess

of three hours.   (It was common for individuals to travel long distances to visit Mountain Medical.)

▮▮▮▮▮ advised that she would then have her vitals taken and meet with a person believed to be a

nurse. She stated she would also be asked what her pain was on a scale of 1-10. ▮▮▮▮ advised that

11

she would then have the same prescriptions called in to a pharmacy and she would pick them up.

28. ████████advised that she never obtained an X-Ray or MRI while being seen from 2003 to 2007. She estimated that she saw Dr. Hoover three times. ████████advised she was not placed on any type of treatment plan other than receiving prescriptions.

29. ████████advised that most people are aware that WWC is a "pill mill" and that in her opinion a patient was simply providing cash in exchange for prescriptions. She described the office's practice as "like herding cattle through a process". She advised the staff was constantly hurrying to cycle individuals though the process. She stated she observed numerous individuals completing the same process to obtain prescription drugs, mainly Hydrocodone. ████████advised that it was obvious most of the patients at WWC were drug seekers and the office was set up to provide them with those drugs. ████████advised that she also overheard individuals discussing selling their prescriptions while she was attending the office.

30. On April 20, 2006, a complaint was received by the DEA from ████████████████ of ████ ████████████a registered nurse employed through ████████████████████, indicated that a relative of hers, ████████████ was receiving controlled substance prescriptions from the WWC and was addicted to, and abusing pharmaceuticals. ████████ indicated that ████████had been going to the WCC for approximately three years and obtaining prescriptions. ████████ indicated that about four years ago, ████████had an accident where she hurt her ankle. She was also involved in two auto accidents. ████████ did not believe that ████████was receiving the controlled substance prescriptions pursuant to a valid medical need. ████████indicated that ████████ad been arrested on several occasions for DUI of prescription medications and had been involved in accidents while

12

under the influence of the prescription medications. ▮▮▮▮ indicated that the last accident had

occurred approximately one week ago.  The accident involved a four wheeler and that ▮▮▮▮ had

been arrested for DUI regarding the prescription medication she obtained from the WWC.

▮▮▮▮ indicated that ▮▮▮▮ had gone through a drug rehab program in November of 2005, but

was still receiving prescriptions through the WWC. ▮▮▮▮ stated that she had contacted the

WWC by telephone five or six times within the past two years in an attempt to talk with a doctor to

pass on the information regarding ▮▮▮▮ drug abuse problem ▮▮▮▮ stated that she spoke with

a receptionist on each occasion (name unknown) and was told that the information would be passed

on to the doctor. ▮▮▮▮ stated that she was not allowed to talk to the doctor. When asked about

other individuals from her community going to the WWC, ▮▮▮▮ indicated that the whole county

goes there because it is known as the place to get drugs.

31.  On November 28, 2005, a telephone call was received at the DEA from an individual

identifying himself as ▮▮▮▮ of ▮▮▮▮, ▮▮▮▮ called to complain about the WWC

located in Williamson, West Virginia and the lack of care he had received at the center. ▮▮▮▮

indicated that while he had visited the WWC on numerous occasions, (receiving controlled substance

prescriptions) he had only seen a doctor on one occasion.

32.  ▮▮▮▮ indicated that he was under total disability through West Virginia workers'

compensation for leg problems and a back injury. ▮▮▮▮ indicated that he had first seen Dr. William

Ryckman in approximately 1996, when Ryckman was practicing with Dr. Diane Shafer in

Williamson, West Virginia. ▮▮▮▮ stated that when the WCC opened a few years ago he started

treatment there ▮▮▮▮ indicated that he paid $450 on his first visit and saw Dr. Katherine Hoover,

but on subsequent occasions he saw office staff (Mary LNU, Myra Miller) who weighed him and

13

took his blood pressure and would then call in prescriptions for him (Hydrocodone and Alprazolam). ███████ stated that some prescription bottles had listed Donald Kiser, MD as the prescribing physician but that ██████ had never seen Dr. Kiser.  Your affiant is aware that Dr. Kiser was a doctor employed at the WWC. ██████ stated that all prescriptions were called in to the Food City Pharmacy in South Williamson, Kentucky. ██████ indicated that he had stopped going to the WWC approximately four months ago.

33.  A statement was taken from ████████████ of ████████ ██████████ by the West Virginia State Police on January 18, 2008. ███████ indicated he had been a patient of Dr. Hoover's since January of 2005 for a back injury. ███████ stated that Dr. Hoover examined him during his first visit and wrote him prescriptions for Valium and hydrocodone. ███████ was asked to pick from a list of four pharmacies where he would like to fill his prescriptions. Following the initial visit, ███████ stated that for the next eight to ten months he would go to the office every two weeks. On these visits he would not see a doctor but would simply have his blood pressure taken and the office would call in prescriptions for him. ███████ stated that he was not getting better so requested to see a doctor. ███████ stated that when he asked to see a doctor the staff would get irritated and make him wait three to four hours before he could see Dr. Hoover. The last time ███████ saw Dr. Hoover, she got mad and asked why he wanted to see her. ███████ told her that he wanted to know why his back was hurting in a different area than it did originally. During ███████ last visit to the office he asked to see Dr. Hoover and got in an argument with "Myra".  Your affiant believes "Myra" to be Myra Miller, Mountain Medical's office manager.

34.  According to ███████ "Myra" told him that he was being treated for a shoulder injury and not a back injury. ███████ thought that this was said as a way to get rid of him ███████

14

stated that "Myra" told him that Dr. Hoover would not be seeing him anymore and threw ███████
out of the office. When ███████ returned the next day, Dr. Hoover would not see him and was
referred to another doctor in Pikeville, KY ███████ indicated that people in the area suggest that
you go to Dr. Hoover's office (Mountain Medical) because she will write prescriptions and that Dr.
Hoover's office (Mountain Medical) is simply a "pill mill."

    35.  On or about January 20, 2006, members of the West Virginia State Police arrested the
following individuals for obtaining controlled substances (hydrocodone) from the WWC while
receiving the same or similar drugs from other physicians (doctor shopping):



    (a) ███████████ was interviewed on January 20, 2006. He advised that he was
obtaining Hydrocodone from multiple physicians and was addicted to the same. ███████ advised
he was referred to the WWC due to a knee injury. ███████ advised that he had been going to the
clinic for one to two years ███████ advised he saw Dr. Hoover during his initial office visit and
that she asked him questions and looked at his knee. ███████ estimated that this meeting took less
than fifteen minutes. ███████ advised he then picked one pharmacy from a list of several provided
by the clinic and was called in Hydrocodone and Xanax. ███████ advised that he did not ask for
the Xanax. ███████ advised that he then returned each month and went to what he described as
a "bank teller window". ███████ advised he would then provide a lady his name and date of birth.
███████ would pay the "teller" cash and wait for his name to be called out over the loud speaker.

15

████ advised that he would have his weight and blood pressure taken. ████ would then pick his prescriptions up at the predetermined pharmacy. ████ advised that he was told by Dr. Hoover that the prescriptions were the only treatment that he would receive at this location. ████ advised that he also asked the staff why other doctor's names that he had not seen such as Dr. Ryckman and Dr. Kiser were on the prescription bottles. ████ was told that it was fine because it was a group of doctors.

(b) On January 20, 2006, ████ was interviewed pursuant to his arrest for obtaining a controlled substance by fraud. ████ recalled that approximately (6) six or (7) seven years prior to this interview he received a hip injury. ████ was referred to Dr. Hoover at Williamson, West Virginia, during treatment for that injury. Upon the first visit to Dr. Hoover, ████ advised that she sent him for an MRI and gave him a "check up." ████ advised that he then continued to visit Dr. Hoover's office approximately once a month over a (4) four to (5) five year period. During that time period, ████ stated that he was "questioned by and saw a doctor" on approximately three to four occasions. ████ stated that during a majority of the visits to Dr. Hoover, he was generically evaluated by a nurse who would write down his "weight and blood pressure" prior to calling in a refill for his prescriptions at Family Discount Pharmacy in Logan, West Virginia. The prescriptions were for hydrocodone and Alprazolam. ████ stated that it was his understanding that patients went to Dr. Hoover and received refills while rarely being seen by a doctor. ████ stated, "It's obvious that everybody now goes there for pills."

UNDERCOVER VISITS

16

36.    Undercover (UC) visits have verified the information provided through public complaints and other sources of information. Below is a summary of those visits:

A. August 16, 2005

The UC officer (███████ of the WVSP, █████████████) entered the facility and approached the receptionist and was told the cost of the office visit would be four hundred and fifty dollars. Along with a patient questionnaire, the UC was given a narcotic contract prior to any conversation with a doctor. The UC indicated on the questionnaire that he had headaches and back pain. The UC then waited in the reception area to be called. While in the reception area, the UC spoke with another individual who was waiting who stated that Dr. Hoover was the one to see for pills, and that they (WWC) were going to require that the UC have an x-ray in order to cover themselves. After waiting approximately one hour the UC was weighed and his blood pressure taken and questions asked about his complaint. The UC then returned to the waiting area. After waiting another hour the UC was called to an exam room where an individual (believed to be Camille Swanson Helsel, a nurse practitioner) reviewed the UC's questionnaire and asked the UC how much pain he has on a scale of one to ten. Helsel indicated the number eight to which the UC agreed. Helsel listened to the UC's heart and lungs and had the UC bend over and twist. Helsel then left the exam room and talked with an individual believed to be Dr. Hoover in the hallway. Helsel told Dr. Hoover that the UC has good mobility and some pain when bending over. Dr. Hoover entered the room and asked the UC what he wanted to get back to doing to which the UC stated, "construction." Hoover then told the UC that he needed to exercise and gave the UC a photocopy of a list of exercises. Dr. Hoover then left the room. Helsel gave the UC a prescription for an x-ray with a diagnosis of lumbar sprain. Helsel asked the UC which pharmacy he wanted to use to which the

17

UC responds, "the Wal-Mart in Logan." Helsel responded that they didn't use that pharmacy, and the UC could fill his prescriptions at either the Family Pharmacy in Logan or Hurley's which was down the street. The UC indicated Hurley's. Helsel then advised the UC that the clinic would call in a prescription to Hurley's and the UC could make another appointment up front. The UC subsequently filled the prescription which had been called in under the authorization of Dr. Katherine Hoover for ninety 7.5/500 hydrocodone, which were to be taken one tablet, three times per day.

B. SEPTEMBER 14, 2005

The UC informed the receptionist that he was there to get his prescription. The receptionist told the UC that the fee was one hundred and fifty dollars which the UC paid. After waiting approximately one hour, the UC has his blood pressure and weight taken by an unidentified female. The UC is asked what kind of pain level he has on a scale of 1 to 10 to which he responded about an eight. The UC was asked why he did not have an x-ray taken after his previous visit, to which the UC responded that he had no money for an x-ray, since he had paid $450 for his first visit. The unidentified white female responded that the UC would have to see somebody (rather than just be given a prescription) since he did not have an x-ray. The female stated that the UC should tell her (the next person he would see) why he didn't get an x-ray and that maybe she'd let him slide (give UC a prescription). The UC returned to the waiting area and after waiting approximately two and one half hours he was called into an exam room and seen by an individual believed to be Camille Swanson Helsel. Helsel informed the UC that the UC needed to get an x-ray because if the "feds" walk in right now, she wanted them to be able to pick up any "fucking" chart that they want and find that the clinic is either searching for what's wrong with the patient or find "why I think you

18

need these rather than some Advil or tell you to go to Wal-Mart and tell you to buy some Tylenol". Helsel was referring to the hydrocodone previously prescribed to the UC.

Helsel went on to discuss UC's back pain and the requirement for the UC to get an x-ray. Helsel then told the UC that she would call in his medicine so that it would be ready. Helsel gave the UC a prescription for an MRI and told him that he was done. The UC checked with the receptionist who told the UC that the prescription would be called in to Hurley's. The UC left the WWC, went to Hurley Drug store and obtained ninety Hydrocodone 7.5/500 tablets based on the "call-in" prescription. The prescription was under the authorization of Dr. Katherine Hoover and is under a "sig" of 1 tablet 3 times per day for pain.

C.  October 13, 2005

The UC entered the reception area and spoke with the receptionist, an unknown female. The female requested the payment of one hundred and fifty dollars for the visit which was paid by the UC. The UC indicated that he had brought an x-ray with him as requested. The UC was seen by an employee that identified herself as "Mary". (This may be Mary Yates, a nurse at the clinic.)  The UC gave the x-rays to Mary and informed her that the doctor who took the x-rays said he couldn't find anything wrong with him.  The UC told Mary that his pain in his back is about the same.  He also asked Mary for some Xanax to help him with his sleeping.  Mary documented the name of the doctor who took the x-ray, and gave the x-ray back to the UC.  The UC then went to Family Discount Pharmacy in Mount Gay, West Virginia and filled the call-in prescriptions.  The prescriptions consisted of 90 Hydrocodone 7.5/500 and 30 Alprazolam .5mg.  The prescription bottles indicated that they had been called in under the authorization of Dr. William Ryckman.  The UC had never been seen by Dr. Ryckman.

19

Following this UC visit, phone calls were made to the WWC by a member of the West Virginia State Police. The officer asked the unidentified female who answered the phone if he could speak with Dr. Ryckman. The female indicated that Dr. Ryckman was not in the office that day and that Dr. Chico was at the practice. She added that Dr. Ryckman would not be in anytime that day. During a second call the unidentified female indicated that she thought Dr. Ryckman might be back at the beginning of the following week but was not sure.

D.  November 17, 2005

The UC entered the WCC and provides the receptionist with his name, date of birth, and one hundred and fifty dollars. The UC was then called back where he is seen by a female who weighed him and took his blood pressure.  She then asked the UC if he smoked or was allergic to any medicine. The UC is then requested the UC to sign a form.  The UC informed the female that he would like to pick his medicine up at the same pharmacy as before. The UC responds to the Family Pharmacy in Mount Gay, West Virginia, where he obtained ninety 7.5mg hydrocodone tablets and 30 .5mg Alprazolam  tablets pursuant to "call-in" prescriptions  from the WWC under the DEA registration and authorization of  Dr. Hoover.

E.  December 16, 2005

The UC entered the WWC and paid the receptionist one hundred fifty dollars and provided his name and date of birth.  After a short wait, the UC was taken in to a private room.  The UC was seen by a nurse who took his blood pressure.  The nurse also asked him, on a scale of one to ten, how much pain he had.  The UC said  eight.  The nurse asks the UC if he was taking any medication, if he was working, or if he smoked.  The UC answered, "no", to the questions.  The nurse then asked

THE

the UC to sign a form pertaining to the questions that were just asked of him.  The nurse asked the UC how long it has been since he has seen a doctor.  He responds, "twice", meaning two doctor's visits.  The UC was told he can pick his medicine up in "Logan", meaning the Family Discount Pharmacy in Logan, West Virginia. (This meeting lasted less than four minutes).  The UC then obtained ninety (90) hydrocodone and thirty (30) Xanax from Family Discount Pharmacy in Logan. The prescriptions were issued under Dr. Ryckman's name and DEA number.

DR. DONALD KISER, D.O.

37.  In February 2005, Dr. Donald Kiser D.O. was arrested in Mingo County, on state charges and was later prosecuted federally on charges related to a conspiracy to distribute prescription drugs. In February 2008,  Dr. Kiser was sentenced to eighty-seven months in prison. At the time of his initial arrest on the state charges, he was a physician employed at the WWC.

38.  On May 29, 2007,  Dr. Kiser  advised that, in 2004,  he had been practicing as an Emergency Room Physician at Williamson Memorial and was recruited by Myra Miller, office manager of the WWC ,  to go to work at WWC as an independent contractor.

39.  Kiser advised that he was paid two thousand dollars ($2,000) a day by WWC for his services. Kiser advised that initially he was responsible for  reviewing established patient files and calling in prescriptions. Kiser advised that he would then place patient charts in boxes corresponding with area pharmacies that the practice dealt with for the prescription to be called in.  Kiser advised that from reviewing these charts, he noticed that it had been several years since some patients had seen a doctor. Kiser advised that Doctors Hoover's and Ryckman's patient files appeared very

limited in detail. Kiser stated that it appeared the WWV was providing prescriptions in exchange for money.

40. Kiser advised that as many as four hundred patients a day were processed through the practice while he was there. Kiser was asked why all the prescriptions were called in as opposed to being written out. Kiser advised that a physician could not physically write out all the prescriptions due to hand fatigue and it also prevents patients from altering the prescriptions.

41. Kiser advised that the standard of practice for the office for cash payment was to charge a first time fee of three hundred fifty dollars. The patient was then seen by a doctor and established as a patient. Kiser advised that the patient would then choose a pharmacy from a pre-selected list of pharmacies. Kiser advised that generally the patient was to have some sort of an x-ray or MRI conducted before their second visit. Kiser advised that from that point on the patient was to return to the clinic every month, have their vitals taken by a nurse and would only see a doctor if they requested. Kiser advised patients were then charged a lesser amount in cash for each additional monthly visit. He stated he was not certain on the office prices due to him not being involved in the payment procedures. Kiser advised that on one occasion there was no physician on duty at the clinic and he was provided with information to call in prescriptions while he was on duty at Williamson Memorial. He advised that the other physicians (Hoover and Ryckman) did not like him questioning their prescribing habits or methods of treatment. Kiser advised that members of the practice also did not approve of the discharging of patients for substance abuse.

42. Kiser advised that at the time of his employment, Dr. Ryckman ran the clinic and Myra Miller was the office manager. Kiser advised that the other practicing physicians were Dr. Hoover

and Dr. Chico. Kiser advised that Dr. Ryckman [who lived in Pennsylvania] would make limited appearances at the clinic. Kiser advised that there were several other nurses or nurse technicians and one nurse practitioner named Camille Helsel. Kiser advised that he questioned Dr. Ryckman and Hoover's practicing of medicine based on chart review and failure to see patients. Kiser advised that the majority of individuals receiving controlled substances are cash patients. Kiser advised that there is a different protocol for patients paying with insurance.

43. Kiser advised that he later became aware that the several rooms at this practice were being monitored by video surveillance. Kiser advised that he observed a money counting machine at the practice and overheard a conversation between Myra Miller and Dr. Ryckman where Ryckman commented, "Why are we paying the accountants if they can not hide the money?"

44. Kiser advised that he was discharged from the clinic after his initial arrest in the beginning of 2005 by Dr. Ryckman through Myra Miller. Kiser advised that he was also told by Myra Miller that with his present charges he had become a "lightning-rod for the feds". Kiser advised that he was later given ten thousand dollars ($10,000) from Dr. Ryckman.

CAMILE HESEL

45. On Wednesday, March 11, 2009, Camille Helsel was interviewed. Helsel advised that she was a nurse practitioner working at the Williamson Memorial Hospital and spoke to Myra Miller about working at the WWC. Helsel advised that she began her employment at the WWC in 2004, after Dr. Donald Kiser had joined the practice. Helsel advised that she was initially paid three thousand dollars ($3,000) a week.

23

46. Helsel advised that when she first went to work at the clinic the doctors present were: Owner Dr. William Ryckman, Dr. Katherine Hoover, Dr. Donald Kiser and Dr. Eric Chico. Helsel advised that her job was to document and update patient's medical files. Helsel advised that it varied how many physicians would be on duty at a time, but generally it was one physician and some times the physician would only be available by telephone. Helsel advised that the clinic would average about one hundred fifty patients a day. On busy days, they would have as many as three to four hundred or more patients a day. Helsel advised that the patients were predominately (70%) cash patients and were paying four hundred fifty dollars ($450.00) for a first time patient and one hundred fifty dollars ($150.00) for established patients. Helsel advised that the practice generally only accepted insurance from individuals involved in crashes from KY due to "P.I.P.", which allowed them a guarantee of ten thousand dollars ($10,000.00), a patient. The patients were then referred to the Aquatic Rehab Center across the street until the said amount was exhausted and then the patient became a cash patient returning to the clinic monthly.

47. Helsel advised that she agreed to take over as owner of the WWC in January 2006, after Dr. Kiser's arrest on State charges. She agreed to "pay" Dr. Rykman the previous "owner" $25,000 a month for five years. Helsel then changed the clinic's name to Mountain Medical. The ownership change was also reflected on the West Virginia Secretary of State's website. Myra Miller was listed as a member and the agent for service of process. This change may have been made, at least in part, because of the criminal charges against Dr. Kiser and the fear that the clinic and its owner would be coming under greater scrutiny.

48. Helsel advised that Dr. Hoover was the "bread and butter of the operation" because she would prescribe to anyone which generated the largest income for the clinic.

24

49.  Helsel advised that the clinic would average one hundred and fifty and up to four hundred "patients" a day.  She advised that with the money generated from the first week of the month, all salaries and overhead for the month could be met.  The remaining three weeks' income was pure profit for the business.

50.  Helsel advised that Dr. Hoover used poor documentation when prescribing and she, Helsel, and other nurses had to document the charts to make them appear proper in documentation in the event they were searched by law enforcement. Helsel advised that she and others had brought to Dr. Hoover's attention  individuals suspected of diverting or abusing the controlled substances they were being prescribed.  Hoover continued to prescribe to those individuals.

51.  Helsel advised that usually there was a doctor present at the clinic or was available by telephone.

52.  Helsel described the practice as pain management, but indicated that very few schedule II controlled substances are prescribed for treating pain at this practice. Helsel advised that she was aware of other pain management practices that would prescribe mostly schedule II's. Helsel advised that schedule II's would be better for the patients, because of the damage done to the patients' internal organs by the Tylenol in the Hydrocodone. Helsel advised that they do not prescribe schedule II's in order to maintain a low profile and avoid attention from the authorities.

53.  Helsel advised that she suspected about half of the patients were either drug addicts or were selling the prescription drugs that they obtained. Helsel advised that about half of the patients might actually need the narcotics prescribed. Helsel advised that pain is subjective and, that, in her opinion,  if someone obtains hydrocodone from the clinic and sells it, then that is between that

person and law enforcement.

54. Helsel advised that she believed money was being embezzled or misappropriated from the business and that if an investigation was conducted the money generated from this practice could not be accounted for by the principals. Helsel advised that the cash generated from the business was handled by Myra Miller and employee, Teresa Channels. Helsel advised that money obtained was to be deposited daily at the BB&T Bank in Williamson, West Virginia.

55. Helsel advised that she had no control over the company's finances and that in February 2009, she attempted to pay Dr. Ryckman by check twenty five thousands dollars ($25,000) from the business account and the check did not clear. Helsel advised she later found out that the account had been drained. Helsel advised that as owner she was paid twenty eight thousand dollars a month ($28,000) and her taxes on that money were taken care of by Mountain Medical.

56. Helsel also advised that she always suspected that Dr. Hoover was also obtaining cash from the business based on the fact that Dr. Hoover was being paid just four thousand dollars ($4,000) a week and that salary figure appeared low compared to others salaries and the role that she played in the clinic's operation. Helsel advised that Dr. Hoover stayed in Williamson through the week and traveled back to her home in northern West Virginia on the weekends.

57. Helsel stated that on one occasion, no physician was present at the clinic. She was very busy documenting patient files and noticed that she had completed one hundred fifty (150) patient charts without eating lunch. Helsel advised she also noticed she had three first-time patients. Helsel said she approached Myra Miller, who was speaking to another unknown person about taking a break and was told to get back to work. Helsel advised that she informed Myra that she had seen 150

patients and had three first-time patients waiting. Helsel informed Myra that she was taking a break and walked outside to smoke a cigarette. Helsel advised that she was approached outside by Myra Miller and was told to "not ever fucking discuss numbers of patients in front of anyone else. Don't you ever do that again!"

58. Helsel advised that Kiser left the practice due to legal issues regarding a criminal matter. Dr. Chico left the pain management side of the clinic due to complaints that he spent too much time with patients and would not agree with Hoovers prescribing practices and was "running" off to many patients. Dr. Chico was refused to write controlled substances to people that he felt did not need them. Helsel advised that Chico kept some of Hoover's files as examples of illegal prescribing acts and threatened to turn the same over to the "feds" if she messed with him.

59. According to Helsel, Dr. Chico was still associated with the clinic but only for drug treatment. (It is believed that Dr. Chico provides Suboxone treatment for opiod addiction at another nearby location. Hydrocodone is an opoid.) Helsel advised that for, a period of time, the only doctor with the clinic was Hoover. Helsel advised that Dr. Teleron came on staff in October of 2008 to oversee Hoover due to an issue with the Medical Board. Helsel advised that she has never seen Teleron.


ANALYSIS

60. According to prescription records from the West Virginia Board of Pharmacy,   for the period of December of 2002, until January 25, 2010, Dr. Hoover was the number one prescriber of controlled substances in West Virginia, based upon the number of prescriptions filled under her DEA

registration number as reported by pharmacies in West Virginia. Since December 2002, there have

been 355,132 prescriptions for controlled substance issued under her DEA number. This figure does

not include Dr. Hoover's controlled substance prescriptions filled in Kentucky, which is very close

to her Williamson, West Virginia office.

61. Law enforcement contacted the Mountain Medical office anonymously and was informed

that "the doors open at 7:00 am and the doctor's window opens at 7:30 am." The officer was also

advised that the clinic closes at 4:00 pm every day, Monday through Friday.

62. The West Virginia Board of Pharmacy's database reveals that in 2009, Dr. Hoover had

30,472 unique patient scripts. ("Unique patient scripts" means the number of individuals who filled

controlled substance prescriptions under that physician's DEA registration number.) Dr. Teleron

had 12,205 unique patients scripts filled under his DEA number in 2009. Dr. Ryckman had 1,176

prescriptions filled under his DEA number. Using the unique patients data described above for Dr.

Hoover, Dr. Ryckman, and Dr. Teleron, and assuming that 70% paid at least $150 per visit,

Mountain Medical had total revenue intake in 2009 of $4,604,565, in cash. This number is

conservative as new patients paid up to $450 per visit and it does not include "P.I.P." income.

FINANCIAL INVESTIGATION

63. On April 28, 2009, Dr. Ryckman opened three accounts XXXXXXXXX6880;

XXXXXXXXX6899; and XXXXXXXXX6902, at the BB&T Williamson, West Virginia branch.

Teresa Channels, who represented that she worked for Dr. Ryckman, immediately began depositing

large amounts of cash into account XXXXXXXXX6880. The cash deposits occurred on almost a

daily basis and were approximately $20,000 each. Between April 28, 2009, and July 24, 2009,

28

$1,009,805, in cash was deposited into account XXXXXXXXX6880.

64. Your affiant believes that this financial activity corroborates Heslel's being removed as the "owner." It appears that Ryckman opened these new accounts after the old account that was known to Heslel was closed in February of 2009.

65. On September 1, 2007, Katherine Hoover, residing at Rt. 2, Box 203, Lost Creek, West Virginia, purchased a 2007 BMW, Model 335I convertible, VIN #WBAWL73597PX50531, from A&L Motor Sales, located in Monroeville, Pennsylvania, for $53,675. Dr. Hoover paid a $17,000 cash down payment on the vehicle, which caused A&L Motor Sales to issue a Currency Transaction Report. The balance due on the vehicle was $36,750. The West Virginia Department of Transportation Division of Motor Vehicles provided a DMV-1-TR, Application for a Certificate of Title for a Motor Vehicle, signed by Katherine A. Hoover, Rt. 2, Box 203, Lost Creek, Harrison County, West Virginia 25661. The vehicle, a 2007 BMW Model 335I convertible, VIN #WBAWL73597PX50531, is listed as being free and clear of any liens and encumbrances.

66. Your affiant has reviewed wage reports for Mountain Medical Care Center, LLC. Myra Miller earned, from the 1st quarter of 2006 through the 4th quarter of 2008, total wages of $1,163,842.70. William F. Ryckman, MD began paying wages to Myra Miller in the 2nd and 3rd quarter of 2009. Myra Miller received total wages of $193,776.

67. Your affiant has reviewed Branch Banking and Trust (West Virginia) bank statements from accounts maintained by Myra C. Miller and John J. Miller, 231 Central Avenue, South Williamson, Kentucky. As of January 27, 2010, an Investors Deposit Account, Account No.

XXXXXXXXXX9358 and Classic Banking - MM Account, Account No. XXXXXXXXXX9439 were active accounts maintained by the Millers.

68. In 2009, West Virginia wage reports for the second and third quarters, for the clinic do not show wages paid to Dr. Hoover. Bank records from account XXXXXX7905 maintained by Dr. Hoover at Wesbanco Bank, Inc., show that Dr. Hoover received fairly regular checks from Dr. Ryckman's BB&T account (XXXXXXXXXX6880) which was associated with the clinic. The checks were signed by Myra Miller. The checks ranged from $2,500 - $5,000. Dr. Hoover also maintained a savings account (XXXXXX3002) at Wesbanco Bank, Inc.

69. Between January, 2006 and May of 2009, a number of the individuals who obtained controlled substance prescriptions under the DEA registration numbers of Dr. Hoover and Dr. Teleron were Medicare beneficiaries. Medicare was a program established and funded by the United States to provide health insurance to the elderly, severalty disabled, or persons with specific chronic medical conditions. As previously indicated, the clinic did not accept Medicare as a form of payment and required at least $150 cash per visit. Some of the Medicare beneficiaries who paid cash to receive controlled substance prescriptions from these doctors used their Medicare benefits to pay $383,452 to pharmacies for the drugs. Medicare would not pay for prescription drugs that were not medically necessary and/or that were not prescribed pursuant to a valid prescription issued in normal course of medical practice. Given the facts outlined above, Medicare was likely defrauded of at least $383,452.00 by the physicians, the employees of the clinic and the beneficiaries who caused that money to be paid to Medicare pursuant to the operation of Mountain Medical.

70. It is your affiant's belief that the physicians and employees of Mountain Medical are operating, and have operated for a period extending five years, what is commonly known as a "pill mill". Physicians seem to have developed a pattern of activity that they believe will protect them from prosecution through their use of x-rays and/or MRIs to document some type of examination being conducted, as well as having the office employees perform a cursory examination at least monthly on each patient. Your affiant believes that the facts contained in this affidavit instead shows a clear history of criminal activity that allows the physicians and employees of Mountain Medical to accumulate large sums of cash, while "seeing" as many patients as possible in as short a time period as possible. Patients that ask to see a physician are forced to sit for an extended period of time, in what your affiant believes is a deterrent to patients who actually want to be treated for whatever medical ailment they are experiencing.  Your affiant has been able to verify the testimony of those involved in criminal activity whose testimony might otherwise be deemed unreliable, through a series of undercover visits by the West Virginia State Police to Mountain Medical, as well as the testimony of others. These practices conducted by Dr. Ryckman and others at the clinic were also substantiated by the action taken against Dr. Ryckman by the West Virginia Board of Medicine in 2004.

71. Your affiant also believes that Mountain Medical's list of local pharmacies for controlled substance prescriptions is an indication of a criminal pattern.  It is your affiant's belief obtained through experiences in other health care fraud matters, that physician's operating as "pill mills" will generally only allow their patients to fill their prescriptions at locally owned pharmacies. National "chain pharmacies" such as Rite Aid or Walgreens are staffed with pharmacists who have little or no financial interest in the amount of revenue generated through the sale of controlled substances,

31

in comparison to locally owned pharmacies. Locally owned pharmacies see a direct benefit in filling these controlled substance prescriptions. Therefore, while a pharmacist working at a pharmacy such as Rite Aid may become concerned by the amount of controlled substances being prescribed by a clinic, and would perhaps, take steps to reject such prescriptions and/or alert law enforcement, pharmacists at locally owned pharmacies often turns a blind eye to the clinic's behavior. The physicians working at pill mills realize this and steer their patients towards more agreeable pharmacies.

## CONCLUSION

Based upon the foregoing, I submit that there is probable cause to believe that any and all funds on deposit at Branch Banking and Trust, Bank Account Nos: XXXXXXXXX6880, XXXXXXXXX6899, XXXXXXXXX6902, XXXXXXXXX9358 and XXXXXXXXX9439; Wesbanco Bank, Inc. Account Nos: XXXXXX3002, XXXXXX7905; and a 2007 BMW, Model 335I convertible, VIN#WBAWL73597PX50531, up to the total of $4,604,565, are forfeitable to the United States pursuant to 18 U.S.C. Section 981(a)(1)(C) and/or Title 18 U.S.C. Section 982(b)(1), as proceeds from one or more violations of Title 21 U.S.C. Section 846, Title 21 U.S.C. Section 841(a)(1), Title 21, U.S.C. Section 841(a)(2), and Title 21 U.S.C. Section 843(a)(3).

And further the affiant saith naught.

JAMES F. LAFFERTY, II
SPECIAL AGENT/FBI

Taken, subscribed, and sworn to before me this 25th day of February, 2010.

HONORABLE MARY E. STANLEY
U.S. Magistrate Judge