UNITED STATES DISTRICT COURT
for the
SOUTHERN DISTRICT OF WEST VIRGINIA
Charleston

FILED
APR 21 2011
TERESA L. DEPPNER, CLERK
U.S. District Court
Southern District of West Virginia

United States of America
    Plaintiff,
v

Civil Action No. 2:11-cv-0101
Civil Action No. 2:10-cv-1087
Judge John T. Copenhaver

$27,671.50, more or less
in United States currency,
(actually a financial instrument
consisting of WesBanco account)

$88,029.08, more or less in
United States currency,
(actually $85,127.08 is a
financial instrument consisting
of the balance of WesBanco
account no. xxxx7905.)

Katherine A. Hoover and John F. Tomasic,
interested parties; no pending federal
criminal charges

In the Matter of the Seizure of Proceeds
on Deposit in Account Nos. xxxx3002 and
xxxx7905 WesBanco, Wheeling, WV, in
the name of Katherine A. Hoover
(this account is also in the name of
John F. Tomasic)

Case No. 2:10-mj-0029

In the Matter of the Search of the
Bedroom used by Dr. Katherine Hoover
located at 110 West Second Ave.,
Williamson, WV.
 Dr. Katherine A. Hoover
    Movant.

Case No. 2:10-mj-0035

MOTION TO CONSOLIDATE THE ABOVE CASES

NOW COME John F. Tomasic and Katherine A. Hoover MD to request that the Honorable John T. Copenhaver consolidate the above cases in the interest of judicial efficiency and for the purpose of a possible appeal to the Fourth Circuit.

All of the cases involve the same issues and the same money. The in rem cases were artificially separated by AUSA Pullin since 2:10-cv 1087 involves part of 2:10-mj-0029 and all of 2:10-mj-0035 and the in rem action 2:110-cv-0101 involves part of 2:10-mj-0035. All four of these cases are currently open and before this honorable Court. The issue of subject matter jurisdiction over the practice of medicine that has been clearly defined in Gonzales v. Oregon 546 U.S. 270, 271 and 272 (see attached portion of the Gonzales ruling Exhibit A) and eliminates federal oversight of the practice of medicine. Supervising the practice of medicine is a state's right and is governed by the Tenth Amendment as discussed in Gonzales. The Court fails to understand the importance of the practice of medicine. The Court has allowed assertions by the FBI to stand as fact, when a FBI agent has no ability to judge a prescription issued for a legitimate medical purpose.

WHEREFORE, John F. Tomasic and Katherine A. Hoover MD hereby request for the consolidation of the four cases: 2:10-mj-0029, 2:10-mj-0035, 2:10-cv-1087 and 2:10-mj-0101 for the purpose of judicial efficiency. John F. Tomasic and Katherine A. Hoover MD hereby give notice to the Court and to the United States' Attorneys office for the Southern District of West Virginia of their plan to appeal any adverse ruling regarding subject matter jurisdiction. The governing of the practice of medicine is actually a matter of stare decis with the correct reading of Gonzales v Oregon.

Respectfully submitted,

*/s/ John F. Tomasic*
John F. Tomasic

*/s/ Katherine A. Hoover MD*
Katherine A. Hoover MD

## CERTIFICATE OF SERVICE

I, Katherine A. Hoover MD, hereby certify that a true and correct copy of MOTION TO CONSOLIDATE THE ABOVE CASES has been sent by Fed-ex to the United States Attorneys Office for the Southern District of West Virginia 300 Virginia St. East, Suite 4000 Charleston, W.V. 25301 on the 18th of April 2011.

*Katherine A. Hoover MD*

Katherine A. Hoover MD
c/o Dr. Norman Gay
N-3222
West Bay Medical Clinic
West Bay Street
Nassau, N.P., Bahamas
242-525-4018

546 U.S. 243, 126 S.Ct. 904, 163 L.Ed.2d 748, 74 USLW 4068, 06 Cal. Daily Op. Serv. 433, 2006 Daily Journal D.A.R. 608, 19 Fla. L. Weekly Fed. S 49

Briefs and Other Related Documents
Judges and Attorneys
Oral Argument Transcripts with Streaming Media

Supreme Court of the United States
Alberto R. **GONZALES**, Attorney General, et al., Petitioners,
v.
**OREGON** et al.

No. 04-623.
Argued Oct. 5, 2005.
Decided Jan. 17, 2006.

**Background:** State of Oregon and others brought action seeking declaratory and injunctive relief preventing federal enforcement or application of United States Attorney General's interpretive rule indicating that physicians who assist suicide of terminally ill patients pursuant to Oregon Death With Dignity Act (ODWDA) would be violating the federal Controlled Substances Act (CSA). The United States District Court for the District of Oregon, Robert E. Jones, J., 192 F.Supp.2d 1077, permanently enjoined enforcement of the rule. The United States Court of Appeals for the Ninth Circuit, 368 F.3d 1118, granted petitions for review and held the rule invalid. Government's petition for certiorari was granted.

**Holdings:** The Supreme Court, Justice Kennedy, held that:
(1) interpretive rule was not entitled to deference as interpretation of allegedly ambiguous regulation;
(2) rule was not entitled to *Chevron* deference; and
(3) CSA did not authorize Attorney General to prohibit doctors from prescribing regulated drugs for use in physician-assisted suicide, as authorized by ODWDA.

Affirmed.

Justice Scalia filed dissenting opinion in which Chief Justice Roberts and Justice Thomas joined.

Justice Thomas filed dissenting opinion.

West Headnotes

[1] KeyCite Citing References for this Headnote

15A Administrative Law and Procedure
    15AIV Powers and Proceedings of Administrative Agencies, Officers and Agents
        15AIV(C) Rules and Regulations
            15Ak412 Construction
                15Ak413 k. Administrative Construction. Most Cited Cases

15A Administrative Law and Procedure    KeyCite Citing References for this Headnote
    15AIV Powers and Proceedings of Administrative Agencies, Officers and Agents
        15AIV(C) Rules and Regulations

expertness, its fit with prior interpretations, and any other *269 sources of weight"). The deference here is tempered by the Attorney General's lack of expertise in this area and the apparent absence of any consultation with anyone outside the Department of Justice who might aid in a reasoned judgment. In any event, under *Skidmore,* we follow an agency's rule only to the extent it is persuasive, see <u>Christensen v. Harris County, 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000)</u>; and for the reasons given and for further reasons set out below, we do not find the Attorney General's opinion persuasive.

### III

[10] As we have noted before, the CSA "repealed most of the earlier antidrug laws in favor of a comprehensive regime to combat the international and interstate traffic in illicit drugs." <u>Raich, 545 U.S., at 12, 125 S.Ct., at 2203.</u> In doing so, Congress sought to "conquer drug abuse and to control the legitimate and illegitimate traffic in controlled substances." *Ibid*. It comes as little surprise, then, that we have not considered the extent to which the CSA regulates medical practice beyond prohibiting a doctor from acting as a drug " 'pusher' " instead of a physician. <u>Moore, 423 U.S., at 143, 96 S.Ct. 335.</u> In *Moore,* we addressed a situation in which a doctor "sold drugs, not for legitimate purposes, but primarily for the profits to be derived therefrom." <u>Id., at 135, 96 S.Ct. 335</u> (quoting <u>H.R.Rep. No. 91-1444, pt. 1</u>, at 10, U.S.Code Cong. & Admin.News 1970, pp. 4566, 4576; internal quotation marks omitted). There the defendant, who had engaged in large-scale overprescribing of methadone, "concede[d] in his brief that he did not observe generally accepted medical practices." <u>423 U.S., at 126, 96 S.Ct. 335.</u> And in <u>United States v. Oakland Cannabis Buyers' Cooperative, 532 U.S. 483, 121 S.Ct. 1711, 149 L.Ed.2d 722 (2001)</u>, Congress' express determination that marijuana had no accepted medical use foreclosed any argument about statutory coverage of drugs available by a doctor's prescription.

[11] [12] In deciding whether the CSA can be read as prohibiting physician-assisted suicide, we look to the statute's text and **923 design. The statute and our case law amply support the *270 conclusion that Congress regulates medical practice insofar as it bars doctors from using their prescription-writing powers as a means to engage in illicit drug dealing and trafficking as conventionally understood. Beyond this, however, the statute manifests no intent to regulate the practice of medicine generally. The silence is understandable given the structure and limitations of federalism, which allow the States " 'great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons.' " <u>Medtronic, Inc. v. Lohr, 518 U.S. 470, 475, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996)</u> (quoting <u>Metropolitan Life Ins. Co. v. Massachusetts, 471 U.S. 724, 756, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985)</u>).

The structure and operation of the CSA presume and rely upon a functioning medical profession regulated under the States' police powers. The Attorney General can register a physician to dispense controlled substances "if the applicant is authorized to dispense ... controlled substances under the laws of the State in which he practices." <u>21 U.S.C. § 823(f)</u>. When considering whether to revoke a physician's registration, the Attorney General looks not just to violations of federal drug laws; but he "shall" also consider "[t]he recommendation of the appropriate State licensing board or professional disciplinary authority" and the registrant's compliance with state and local drug laws. *Ibid*. The very definition of a "practitioner" eligible to prescribe includes physicians "licensed, registered, or otherwise permitted, by the United States or the jurisdiction in which he practices" to dispense controlled substances. <u>§ 802(21)</u>. Further cautioning against the conclusion that the CSA effectively displaces the States' general regulation of medical practice is the Act's pre-emption provision, which indicates that, absent a positive conflict, none of the Act's provisions should be "construed as indicating an intent on the part of the Congress to occupy the field in which that provision operates ... to the exclusion of any State law on the same subject matter*271 which would otherwise be within the authority of the State." <u>§ 903</u>.

Oregon's regime is an example of the state regulation of medical practice that the CSA presupposes. Rather than simply decriminalizing assisted suicide, ODWDA limits its exercise to the attending physicians of terminally ill patients, physicians who must be licensed by Oregon's Board of Medical Examiners. <u>Ore.Rev.Stat. §§ 127.815, 127.800(10) (2003)</u>. The statute gives attending physicians a central role, requiring them to provide prognoses and prescriptions, give information

obviously habit forming or psychotropic, moreover, it relied not on executive ingenuity, but rather on specific legislation. See § 1902(a) of the Anabolic Steroids Control Act of 1990, 104 Stat. 4851 (placing anabolic steroids in Schedule III).

The statutory scheme with which the CSA is intertwined further confirms a more limited understanding of the prescription requirement. When the Secretary considers Food and Drug Administration approval of a substance with "stimulant, depressant, or hallucinogenic effect," he must forward the information to the Attorney General for possible scheduling. Shedding light on Congress' understanding of drug abuse, this requirement appears under the heading "Abuse *274 potential." 21 U.S.C. § 811(f). Similarly, when Congress prepared to implement the Convention on Psychotropic Substances, it did so through the CSA. § 801a.

[15] The Interpretive Rule rests on a reading of the prescription requirement that is persuasive only to the extent one scrutinizes the provision without the illumination of the rest of the statute. See Massachusetts v. Morash, 490 U.S. 107, 114-115, 109 S.Ct. 1668, 104 L.Ed.2d 98 (1989). Viewed in its context, the prescription requirement is better understood as a provision that ensures patients use controlled substances under the supervision of a doctor so as to prevent addiction and recreational abuse. As a corollary, the provision also bars doctors from peddling to patients who crave the drugs for those prohibited uses. See Moore, 423 U.S., at 135, 143, 96 S.Ct. 335. To read prescriptions for assisted suicide as constituting "drug abuse" under the CSA is discordant with the phrase's consistent use throughout the statute, not to mention its ordinary meaning.

The Government's interpretation of the prescription requirement also fails under the objection that the Attorney General is an unlikely recipient of such broad authority, given the Secretary's primacy in shaping medical policy under the CSA, and the statute's otherwise careful allocation of decisionmaking powers. Just as the conventions of expression indicate that Congress is unlikely to alter a statute's obvious scope and division of authority through muffled hints, the background principles of our federal system also belie the notion that Congress would use such an obscure grant of authority to regulate areas traditionally supervised by the States' police power. It is unnecessary even to consider the application of clear statement requirements, see, e.g., United States v. Bass, 404 U.S. 336, 349, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971); cf. BFP v. Resolution Trust Corporation, 511 U.S. 531, 544-546, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994), or presumptions against pre-emption, see, e.g., Rush Prudential HMO, Inc. v. Moran, 536 U.S. 355, 387, 122 S.Ct. 2151, 153 L.Ed.2d 375 (2002), to reach this commonsense conclusion. For all these reasons, we conclude the CSA's prescription requirement does not authorize*275 the Attorney General to bar dispensing controlled substances for assisted suicide in the face of a state medical regime permitting such conduct.

IV

The Government, in the end, maintains that the prescription requirement delegates to a single executive officer the power to effect a radical shift of authority from the States to the Federal Government to define general standards of medical practice in every locality. The text and structure of the CSA show that Congress did not have this far-reaching intent to alter the federal-state balance and the congressional role in maintaining it.

**926 The judgment of the Court of Appeals is

*Affirmed.*

Justice SCALIA, with whom Chief Justice ROBERTS and Justice THOMAS join, dissenting.

The Court concludes that the Attorney General lacked authority to declare assisted suicide illicit under the Controlled Substances Act (CSA), because the CSA is concerned only with " *illicit* drug dealing and trafficking," *ante,* at 923 (emphasis added). This question-begging conclusion is obscured by a flurry of arguments that distort the statute and disregard settled principles of our interpretive jurisprudence.

Contrary to the Court's analysis, this case involves not one but *three* independently sufficient grounds for reversing the Ninth Circuit's judgment. First, the Attorney General's interpretation of



FedEx International Air Waybill

1. From:
Date: 04/18/11
Sender's Name: Katherine Hoover
Phone: 242-525-4018
Company: c/o Dr. Norman Gay
Address: West Bay Med Clinic
Address: West Bay St.
City: Nassau
State/Province: N.P.
Country: Bahamas

2. To:
Recipient's Name: Clerk
Phone: 304-347-3000
Company: USDC SDWV
Address: 300 Virginia St. E.
Address: Suite 2400
City: Charleston
State/Province: WV
Country: US
ZIP/Postal Code: 25301

Commodity Description: Doc